OA9VABRS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        20 Cr. 411 (RA)

 5   HESHL ABRAHAM,

 6              Defendant.                Sentence

 7   ------------------------------x

 8                                        New York, N.Y.
                                          October 9, 2024
 9                                        11:05 a.m.

10
     Before:
11
                        HON. RONNIE ABRAMS,
12
                                          District Judge
13

14                          APPEARANCES

15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   JILAN J. KAMAL
          Assistant United States Attorney
18
     STEVEN Y. YUROWITZ
19        Attorney for Defendant

20

21

22

23

24

25
```

OA9VABRS

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel, please state your name for
 3    the record.
 4              MS. KAMAL:  Good morning, your Honor.
 5              Jilan Kamal, on behalf of the United States.
 6              THE COURT:  Good morning.
 7              MR. YUROWITZ:  Good afternoon, your Honor.
 8              Steven Yurowitz for Heshl Abraham, who's to my right.
 9              THE COURT:  Good morning to you as well.
10              So in connection with today's proceeding, I have
11    reviewed the following submissions:
12              The presentence investigation report, Mr. Heshl's --
13    excuse me, Mr. Abraham's sentencing memorandum dated June 14th,
14    with accompanying exhibits; the government's sentencing
15    memorandum dated June 24th, and its supplemental letter of
16    September 16th, and the victim impact statement.
17              I also understand that we have an amended consent
18    order of forfeiture is that correct?
19              MS. KAMAL:  That's correct, your Honor.
20              THE COURT:  Is there anything else?  Am I missing
21    anything?  Anything I haven't mentioned?
22              MS. KAMAL:  Not from the government.
23              MR. YUROWITZ:  Your Honor, there's a letter that we
24    submitted on June 24th replying to the government's sentencing
25    submission.  And there's the video that we submitted, which I
```

OA9VABRS

1    hope your Honor has had an opportunity --

2             THE COURT:  I have not seen either of those.  I'm

3    sorry, I did not see the -- I'm happy to take a break now and

4    review it, of course.  Was the June 24th letter addressing the

5    issue with respect to intended loss?

6             MR. YUROWITZ:  No, this was addressing the

7    government -- statements made in the government's sentencing

8    memo.

9             THE COURT:  I'm sorry.  My apologies.

10            I will have them printed right now.

11            And we can put the video on.  How long is the video?

12            MR. YUROWITZ:  It's about six minutes.

13            THE COURT:  Okay.

14            MR. YUROWITZ:  I have a link for it.

15            THE COURT:  Okay.

16            MR. YUROWITZ:  Your Honor, given the sensitive nature

17   of it, I would just ask if your Honor maybe could review it in

18   chambers.

19            THE COURT:  Sure.  I'm happy to take a break now.  And

20   I apologize, I'm not sure why I didn't see that.

21            Okay.  So why don't we take a ten-minute break.  I

22   will review it.

23            Just hold on one second.

24            I'm just going to look at the video in the robing

25   room, as well as the letter.

OA9VABRS

1          MR. YUROWITZ:  Thank you, your Honor.

2          (Recess)

3          THE COURT:  You can be seated.

4          So I have now reviewed the video and your letter.  I'm

5    not going to put the video on the docket because it contains

6    some very personal information about the defendant's children.

7    But your letter should go on the docket; like you should always

8    be filing things on the docket.  We didn't see it on the

9    docket, but I have it now.  I've read it.  I'm going to put it

10   on the docket.

11         MR. YUROWITZ:  I apologize, your Honor.  I thought I

12   had filed it, but --

13         THE COURT:  No, it's fine.  Let's just move forward

14   from here.  But that's just why I missed it and I apologize for

15   that.

16         So I have all of that, thank you.

17         Why don't we begin by discussing the presentence

18   report, which was prepared by the probation department.

19         Mr. Yurowitz, have you reviewed the presentence report

20   and discussed it with your client?

21         MR. YUROWITZ:  Yes, your Honor.

22         THE COURT:  And Mr. Abraham, have you had enough time

23   and opportunity to review the presentence report?

24         Yes.  You have to speak into the microphone and speak

25   so I can hear you.  Thank you.

OA9VABRS

| | |
|---|---|
| 1 | THE DEFENDANT:  Yes. |
| 2 | THE COURT:  Okay.  Thank you. |
| 3 | Now, Mr. Yurowitz, I know you made a few objections to |
| 4 | the presentence report to the probation department.  Are there |
| 5 | any that you want to raise with me at this point in time? |
| 6 | MR. YUROWITZ:  Your Honor, the only one, I would say |
| 7 | minor clarification, is there's a statement in paragraph 34 |
| 8 | that's attributed to Heshl.  In the government's own sentencing |
| 9 | submission on page 6, they make clear that that line was |
| 10 | actually said by Zishe.  I don't think it's going to affect the |
| 11 | sentence, but just for keeping things straight, I think it may |
| 12 | warrant correction. |
| 13 | THE COURT:  It's the last sentence in paragraph 34 |
| 14 | that says "In response, Heshl Abraham," is it that, sent a |
| 15 | link, or is it earlier -- |
| 16 | MR. YUROWITZ:  Let me just -- |
| 17 | THE COURT:  Sure. |
| 18 | MR. YUROWITZ:  It's the sentence "This is how I know, |
| 19 | because they link both of my vendor accounts."  That was not -- |
| 20 | THE COURT:  Yeah.  That's the sentence I -- it starts |
| 21 | with:  "In response, Heshl Abraham sent a link to a VPS company |
| 22 | and texted VPS company I use now.  This is how I know, because |
| 23 | they linked both of my vendor accounts." |
| 24 | MR. YUROWITZ:  Yes. |
| 25 | THE COURT:  Okay. |

OA9VABRS

1          Does the government agree that that, in fact, was not

2     Heshl Abraham who said that?

3          MS. KAMAL:  What has happened here, your Honor, in

4     paragraph 34 is that there's been a conflation of statements

5     by -- in the WhatsApp text by Defendant Zishe Abraham and Heshl

6     Abraham.  So, for instance, as reflected in the government's

7     sentencing submission on page 6, Heshl Abraham does send the

8     link to a VPS company and says "VPS company I use now."  But

9     the response is from Zishe Abraham, who says this is -- "This I

10    know because they linked both of my vendor accounts."

11         THE COURT:  Okay.  So I'm going to add in the words

12    "after and texted VPS company I use now."  I'm going to then

13    add the words "to which Zishe Abraham responded," and then

14    include the next -- the quote, "This is how I know."

15         Is everyone comfortable with that?

16         MR. YUROWITZ:  Yes.

17         MS. KAMAL:  Yes, your Honor.

18         THE COURT:  Okay.  All right.

19         MR. YUROWITZ:  The only other thing that I would just

20    point out — I think it's reflected in the footnote — is, you

21    know, I think the whole conversation was taken out of context

22    because, as the government -- as I wrote in my June 24th

23    submission, it was very clear that with respect to the Amazon

24    accounts, he was using a static IP address.  But, like I say, I

25    don't think this is something to get bogged down on; it's in

OA9VABRS

1     the footnote.

2              THE COURT:  Okay.  It's in the footnote.  I've read

3     the footnote.

4              All right.  But there are no other objections.  Thank

5     you.

6              Does the government have any objections to the

7     presentence report?

8              MS. KAMAL:  No, your Honor.

9              THE COURT:  The Court adopts the factual findings in

10    the report.  The presentence report will be made part of the

11    record in this matter and placed under seal.  If an appeal is

12    taken, counsel on appeal may have access to the sealed report

13    without further application to the Court.

14             Mr. Abraham, when you pled guilty, the federal

15    sentencing guidelines were discussed.  Do you remember that?

16             THE DEFENDANT:  Yes.

17             THE COURT:  The guidelines — and for those of you that

18    are here and may not know — they are contained in a book that

19    looks like this.  There are a set of rules that are published

20    by the United States Sentencing Commission.  They are designed

21    to guide judges when they impose sentence.  At one time they

22    were mandatory, meaning judges were required to follow the

23    guidelines.  They are no longer mandatory.  But nonetheless,

24    the judges must properly calculate the guidelines and consider

25    them in determining an appropriate sentence.

OA9VABRS

1          So I understand that consistent with the plea

2    agreement, the parties agree that the guidelines range here, as

3    calculated under the November 2023 manual, is 30 to 37 months.

4    The government has nonetheless conducted its own independent

5    calculation of the guidelines, which I'm obligated to do.  And

6    among other things, what I did is I did analyze intended loss,

7    relying on Government Exhibit 4.

8          But, in any event, the offense level and the

9    guidelines range is the same.  So I just want to make sure we

10   all agree that Mr. Abraham's offense level is 19, his criminal

11   history category is I, and his recommended guideline sentence

12   is 30 to 37 months.  Are we all in agreement about that?

13          MS. KAMAL:  Yes, your Honor.

14          MR. YUROWITZ:  Yes, your Honor.

15          THE COURT:  Okay.  Thank you.  All right.

16          That being said, as I said a moment ago, that range is

17   only advisory.  So courts can impose a sentence outside of that

18   range based on one of two legal concepts:  A departure or a

19   variance.  A departure allows for a sentence outside of the

20   advisory range based on some provision in the guidelines

21   themselves.

22          In the plea agreement, both parties agree that no

23   departure from the guidelines range was warranted.

24   Nevertheless, I've considered whether there is an appropriate

25   basis for a departure from the advisory range.  And while

OA9VABRS

1    recognizing that I have authority to depart, I don't find any

2    grounds warranting a departure.

3            I do though, of course, also have the power to impose

4    a nonguideline sentence based on what we call a variance

5    pursuant to the factors set forth in 18 United States Code,

6    Section 3553(a).  And I know that that's what Mr. Abraham is

7    seeking.

8            So I'd like to hear from the government first.  Would

9    the government like to be heard with respect to sentencing?

10           MS. KAMAL:  Yes, your Honor, very briefly.

11           Look, the Court is very familiar with the conduct in

12   this case and with the conduct of the defendants.

13           What I can say about the conduct here of Mr. Heshl

14   Abraham in particular is that he engaged -- he engaged in

15   overshipping for a long period of time, from at least mid 2017

16   through the fall of 2018, and as reflected in Exhibit 6, which

17   details the product substitution that the defendant engaged in

18   as well.

19           This is egregious, your Honor.  This isn't a momentary

20   lapse.  The defendant was routinely agreeing to pay -- to sell

21   Amazon expensive designer perfumes and sending them bits of

22   plastic, like a plastic beard trimmer, in exchange.

23           So I think with respect to the defendant's arguments

24   that his conduct was a momentary lapse, that it wasn't his

25   intent to defraud, that he thought overshipping was fine and

1     the like, I really don't think the Court should credit those

2     arguments.

3          That said, relative to his co-defendants, Mr. Heshl

4     Abraham did not attempt to defraud Amazon to the same extent as

5     obviously the lead defendant here, Yoel Abraham, or his other

6     co-defendant, Zishe Abraham.

7          I would also note here --

8          THE COURT:  When you say that, what do you mean by

9     that?  I mean, there were group texts in which he discussed how

10    to evade detection by Amazon and reactivate suspended accounts.

11    So tell me exactly what conduct he didn't engage in and his

12    co-defendants did.

13         MS. KAMAL:  That he did not?

14         THE COURT:  That's what I heard your point to be.

15         MS. KAMAL:  What I'm looking at, your Honor, when I

16    make that argument really is the intended loss.  And so with

17    respect to the intended loss here, and to the extent that that

18    is meant to capture the defendants' intent, right, their intent

19    to defraud, the damage he did was more modest compared to, say,

20    Yoel Abraham or Zishe Abraham.

21         That said, the texts, as the Court appropriately

22    notes, speak for themselves.  The defendant was constantly

23    looking for a new angle, a new way to make more automatic and

24    systemize the fraud and to try to extract as much money as

25    possible from Abraham -- from Amazon.

OA9VABRS

```
1            The government would also submit that the defendant's

2    claims that -- look, to the extent that the defendant

3    engages -- and I'm turning now to 3553(a) factors.  To the

4    extent that the defendant engaged in charitable work and

5    charitable concerns, excellent, wonderful, right.  As the Court

6    is well aware, just because the defendant has committed a

7    crime, it doesn't mean that he's a bad person or that he's

8    incapable of good works.  It's wonderful to see someone who

9    does have those impulses and acts on them.

10           But as the text messages also reflect, your Honor, the

11   defendant clearly discussed how to shield assets through a

12   charitable trust.  I think that's reflected in the text

13   messages where he says he's looking for an aggressive lawyer

14   who knows all the cons on how to get around — frankly, the use

15   of one's own money, notwithstanding the fact that it's been

16   shielded from taxation in a charitable trust.

17           So all told, your Honor, the defendant here does

18   warrant an incarceratory sentence.  I will note that the

19   defendant's personal circumstances, the circumstances of his

20   family, they are important.  They warrant consideration, and

21   the government is not suggesting that they aren't significant.

22           That said, the defendant is part of a large family, a

23   close-knit community.  And as evidenced by the fact that he is

24   constantly assisting others by his own accounts, which the

25   government has no reason to doubt, the Court and the government
```

1    would reasonably expect that during the time of his

2    incarceration, the defendant could rely on the help of his

3    family and his community to support his family during that

4    time.  And as reflected in the submissions made to the Court by

5    medical experts or school experts, his family and his children

6    are getting that support that they seem to need already now

7    through the help of the school and other ancillary support

8    providers.

9              So unless the Court has particular questions --

10             THE COURT:  I just want to just follow up on one

11   point.  Just with respect to relative culpability, so I'm aware

12   of the fact that his intended loss figure is lower and his

13   guidelines range is lower as a result as well.

14             MS. KAMAL:  Yes.

15             THE COURT:  But in terms of relative culpability,

16   where do you see him *vis-à-vis* his brothers?

17             MS. KAMAL:  It's a difficult -- it's difficult to

18   slice and dice, your Honor.

19             On the one hand, the evidence of the defendant's

20   intent and the lengths that he was willing to go and consider

21   going to, as reflected in the WhatsApp texts, are egregious.

22   They are worse than his co-defendants, Zishe Abraham who

23   professed --

24             THE COURT:  He at least professed a desire --

25             MS. KAMAL:  Desire to move on.

OA9VABRS

1          THE COURT:  -- to get out of the fraud business,

2    right?

3          MS. KAMAL:  Exactly.

4          Whereas this defendant looked to be trying to entrench

5    it, to continue it, to get overseas workers recruited into it.

6    And so I agree, your Honor, it's very hard to slice and dice

7    with respect to relative culpability.

8          I think in terms of the defendant's mindset here, I

9    think his -- I think he was more committed to the fraud; he was

10   perhaps more careful, simply, in the way he carried it out in

11   order to avoid detection and that's why the intended loss

12   numbers are lower.  But across a range of factors, I would have

13   to say that he is -- that he is in the range of his

14   co-defendant Zishe Abraham.

15         THE COURT:  All right.  Thank you.

16         All right.  Mr. Yurowitz, would you like to be heard?

17         MR. YUROWITZ:  Thank you, your Honor.

18         Your Honor has obviously read the submissions and I

19   know has now reviewed the video.

20         THE COURT:  Actually, I want to start with a question

21   about one of the -- so your June 24th submission, you say that

22   it's highly telling that Heshl's contemporaneous statements

23   reflected his belief that he was not committing a crime when he

24   engaged in overshipping.  Why?  What's wrong with overshipping?

25   Did he think that there was nothing wrong with shipping an

OA9VABRS

1    amount totally inconsistent with what was expected by Amazon?

2              MR. YUROWITZ:  I think, your Honor, the fact that --

3    because from his perspective, I think he saw it as a widespread

4    practice.

5              THE COURT:  As a widespread practice?

6              MR. YUROWITZ:  Among not just --

7              THE COURT:  But clearly was among him and his

8    brothers, right?

9              MR. YUROWITZ:  It was him and his brothers, but I

10   think from his perspective, he saw a lot of other people doing

11   it.  I think it's reflected in the texts as well.  And I think

12   they certainly rationalize it in their own mind that, you know,

13   Amazon was getting goods in return.

14             At the same time, he's quick to admit that, you know,

15   the conduct that he did certainly with the product

16   substitution, he has no defense to that.  He doesn't try to

17   defend that.  He admits now that it's theft, and he's

18   embarrassed by that, and he's accepted responsibility for that.

19             He's pled guilty to the whole scheme.  But I think in

20   his own mind, I think they rationalized at least the

21   overshipping as not as egregious.  And I think that's what was

22   reflected really in the statement, you know, when he asked --

23   you know, this was his private communications.  And the fact

24   that he said what's wrong with overshipping, I think it kind of

25   reflected that mindset that it was a widespread practice and,

1    you know, after all, we're giving them something and we're

2    getting back.  He now recognizes that all of this was a

3    problem.

4              THE COURT:  All right.  You may proceed.  Thank you.

5              MR. YUROWITZ:  So with respect to the -- as I just

6    indicated, with respect to the conduct, neither myself nor

7    Mr. Abraham is going to try to defend or minimize this conduct.

8    As he wrote to probation, any way you slice it, this was theft.

9              I would say, however, that there are several

10   mitigating factors here in terms of the underlying conduct and

11   the relative culpability.

12             First, as the government noticed, from all the

13   brothers, the damage caused by Heshl was the least of all the

14   brothers.  By my math, the intended loss for Heshl was more

15   than 31 percent lower than Zishe, the brother that comes next

16   in line; and was 88 percent lower than Yoel, the brother on

17   top.

18             Second — and this I do disagree with the government —

19   from all the brothers, Heshl's conduct was the shortest of

20   duration.  He was last -- he was from the last to start.  I

21   think him and his brother Zishe, it looked, by my account,

22   based on the new spreadsheet, started the conduct last.  And

23   his conduct ended.  It was not, as the government claims, a

24   scheme that started from mid 2017.  By my review of the

25   spreadsheet, it started -- there was a single instance in

OA9VABRS

November, then a single instance in December, and then it

started with more -- greater frequency in January.  And his was

the last to stop from any defendant.  It stopped in August of

2018.

And just on that point for a second, your Honor, you

know, the government now submitted in response to your Honor's

order a revised spreadsheet.  And I think Ms. Kamal would kind

of confirm this.  I had pointed out for a while that the

spreadsheets initially as to Heshl did not have all his

numbers.  And, you know, we had the subpoena, and Amazon came

back and said that they produced everything.

It was only when it came to Yoel's sentencing that now

they produced a new spreadsheet, and that new spreadsheet had

all of Heshl's numbers.  And the result of that was your Honor

was handed today an amended forfeiture order which, to commend

Ms. Kamal, she lowered the forfeiture number by over $400,000

based on those new numbers.  So I think that -- but even with

now having the full numbers, Heshl's guidelines still remain

the same.

And third, the third point I would make is -- and I

say this advisedly.  The government says that the crime was

committed out of greed.  When it comes to Heshl, I don't think

it's an accurate statement.  By any measure, Heshl did not live

a high lifestyle.  And as we showed in our sentencing memo,

most of the profits he made from the scheme were given away to

OA9VABRS

1  charity.  I want to make clear, we don't say that in any way to

2  justify or defend his conduct.  It's just for the small point

3  of saying that I don't think it's motivated by greed.  And I

4  think that also may explain why Heshl was -- had the lowest

5  loss number and the duration of his involvement was the

6  shortest.

7        And I guess the final point that I would make with

8  respect to the underlying conduct is the text messages.

9  There's been a lot of discussion about them, even today, by the

10  prior sentencing.  And I certainly get they are not pretty.

11        What I would say is as to Heshl, there are a number of

12  statements that were misattributed to him, even as I pointed

13  out in the June letter, there were text messages that were

14  attributed to him as saying when he was passing on a voice

15  note.  I think when people use these messaging systems, they

16  kind of lose themselves and they don't -- they give no thought

17  to what they say.  For that reason, I deleted WhatsApp years

18  ago.  Because people -- I don't think people -- if you would

19  ask him about some of the statements that he made, he probably

20  doesn't even remember.  They are just said without thought.

21        The point is I don't think it's accurate to say that

22  he ever contemplated doing many of those things.  And I think

23  the facts show that.  So like I said, they are not pretty, but

24  I don't think they have, you know, the same -- this is not --

25  they were not said with the intention that -- I think they were

OA9VABRS

1    just, you know, a bunch of brothers talking and not thinking of

2    what they were saying.

3            So to summarize, when it comes to the offense conduct,

4    in terms of culpability, Heshl's conduct is on the bottom of

5    the totem pole.  But I recognize being on the totem pole at all

6    is a problem and Heshl recognized that.

7            But 3553(a) requires a court to take into account more

8    than just the offense conduct, and to look at the defendant as

9    a whole.  In that regard, I think Heshl has a number of

10   extremely positive things to say.

11           First, his work for Chesed 24/7.  I could say from

12   personal experience being part of the sandwich generation,

13   having elderly parents that, unfortunately, have to go to the

14   hospital and in-laws and things like that, I've spent more time

15   in the hospital than I would care for.

16           And I had a recent experience.  We had to rush to the

17   hospital.  It was a Saturday morning.  It was the Sabbath.  You

18   can't take food.  We came at 6 o'clock in the morning, no

19   communication.  And Chesed 24/7 had a roomful of food,

20   everything that we needed, anything that we could have asked

21   for.  And what really blew my mind was after the Sabbath, two

22   hours later, I went up to the room and there was fresh food

23   there.  And, you know, that's the type of work that they are

24   doing, and that's the type of work that Heshl is doing on

25   behalf of this organization.  It's really a wonderful

OA9VABRS

1    organization.

2           And then just in terms of his business, dozens of

3    people reached out to me how Heshl helped them in the business.

4    They were quite surprised to hear that Heshl was involved in

5    illegality.  The sentiment they expressed to me was Heshl, the

6    advice he always offered them was to be aboveboard; and they

7    emphasized to me that since his arrest, when people reach out

8    to them, he emphasizes to them how it's important to stay on

9    the straight and narrow path.

10          And, you know, it's an empty courtroom here.  We could

11   have filled up the courtroom with a lot of people.  All these

12   people would have come, but, you know, there's an aspect of the

13   sentencing that's very private, as your Honor indicated.  And,

14   you know, for that reason, we ask people to respect Heshl's

15   privacy, you know, to not be here.

16          But these people -- there are people -- the acts that

17   he did is far more than charity, giving someone a handout.

18   Propping them up, setting them up in a business is -- and

19   allowing them to earn a livelihood and be self-sufficient, some

20   of these people, you know, they are all in the same business,

21   they are competitors with him.  I think it speaks volumes of

22   who Heshl is as a person.

23          So as I indicated, I ask people not to come because I

24   want to get to kind of the core of the presentation, which is

25   the family circumstances.

OA9VABRS

1    I've represented many defendants.  I don't think I've

2    met a defendant yet who would say that, oh, his family will be

3    able to manage sufficiently while he's in prison.  I'm sure

4    your Honor hears that often.  But I think when it comes to

5    Heshl's situation, it's a different category.  We're talking

6    about --

7         THE COURT:  Let me just -- I have tremendous sympathy

8    for people with families and the harm that will be caused their

9    family by their absence.  But he engaged in this conduct

10   knowing that he had a family, right, and knowing that what he

11   was doing was illegal.  So, I mean, I'm absolutely going to

12   consider those issues, but at the end of the day, this was his

13   choice.

14        And then, you know, also to the government's point, he

15   does, thankfully, have many extended family members.  I don't

16   mean to say it will be easy by any means and I don't want to

17   sound unsympathetic, because I feel a tremendous amount of

18   sympathy.  But I also have to balance those concerns with,

19   among other things, the need for deterrence, the need not only

20   to deter Mr. Abraham from engaging in conduct like this, but to

21   send a message that you engage in this conduct, that, you know,

22   you do willingly and knowingly and, in some instances, looking

23   at the texts, almost gleefully that there will be real

24   consequences and not just staying in your house for a certain

25   amount of time.  So it's just about balancing those concerns.

OA9VABRS

1      MR. YUROWITZ:  I recognize that.  I appreciate that,

2  your Honor.  And I'm going to try to address some of your

3  Honor's statements.

4      THE COURT:  Of course.

5      MR. YUROWITZ:  Heshl recognizes, you know, this was

6  his problem; he created it.  And he has to suffer the

7  consequences.

8      At the same time, I think that we're dealing with a

9  situation that is not -- that is certainly atypical.  You know,

10  my wife is a schoolteacher, I have several daughters.  And one

11  of the things that I realized is you could keep a lot of

12  secrets from a lot of people; you can't keep it from the

13  teachers.  The kids just -- especially younger kids, they'll

14  say things and you just observe the interactions that they

15  have.

16      THE COURT:  It's really sad but, you know, that video

17  also shows that there are a lot of people who really care about

18  and are dedicated to helping his children, right?

19      MR. YUROWITZ:  Yes, your Honor.

20      And I think what then -- your Honor, I had -- one of

21  the people who wrote a letter, who is on the video and actually

22  was going to come today, was Hindi Roth, one of the therapists.

23  And she's actually available by phone, if your Honor would

24  like.  She told me, she said, given the time of year with the

25  Jewish holidays, it's just -- she can't just come in.

OA9VABRS

1          But what she updated me was she's now -- and when she

2   wrote the letter at the time of the video, she was seeing one

3   of the children.  She now sees three of the children for three

4   hours every Sunday, every week.  And she didn't mince words

5   with me.  She said just Mrs. Abraham is not capable of managing

6   on her own.  She says she -- she's there for three children,

7   but she's really giving therapy to five children and

8   Mrs. Abraham, who herself has a therapist who I've spoken to

9   and I'll get to.

10          But the point is, yes, there is -- there is therapy

11  now, there is support.  But that's just keeping them kind of,

12  you know, the head above water.  It's not by any means -- and

13  yes, the community -- a community will step in to help, but

14  there's not someone in the community to come there and sleep

15  there every night.  You know, it's not something that's

16  capable.  And this is not a situation where the grandparents

17  could come in.  Part of it is I spoke to Mrs. Abraham's

18  therapist last night, I had a lengthy conversation with him.

19  That's part of the problem, why she suffers from some of the

20  issues that they have.

21          So I know, yes, this is a problem of Heshl's own

22  making.  But what I would tell you -- what I would say to you,

23  your Honor, you know, there are six children here who are

24  completely innocent.  And your Honor heard from Ms. Lifetag,

25  Ms. Roth, Ms. Ganz, you know, from the school administrator,

OA9VABRS

1    from the rabbi.  I think they all have one voice.  This is not

2    a situation where this mother can manage on her own.

3         And I appreciate the fact that we have to send a

4    message and specific deterrence, that's why I cited from the

5    Sentencing Commission.

6         A lengthy sentence of home confinement is by no means

7    a walk in the Park.  I've had clients.  I know that there are

8    clients that literally, they can't deal with it; they go stir

9    crazy from it.  Sentencing Commission, we quoted it, some

10   people think it's worse than prison.  Here, it's a necessary --

11   you know, it's needed because there's a family that, as one of

12   the therapists said, a sentence of imprisonment would be a

13   death sentence of a family here.

14        So yes, deterrence is necessary.  And I think that any

15   sentence that has home confinement and given the financial

16   penalties that he's facing, the family -- I've heard this from

17   a number of members in the committee, they are not making ends

18   meet; people are stepping in to try to help.  But they are not

19   in a situation to really run the family, which is -- I think

20   every therapist and all the school administrators are one

21   voice.  The only reason the family is where it is today, now,

22   which is, like I say, keeping their head above water, is

23   because of Heshl's presence.

24        So I would just ask your Honor to take all these

25   factors into account and fashion a sentence that is not greater

OA9VABRS

1    than necessary to satisfy the goals contained in 3553(a).   A

2    sentence with a serious component of home confinement, we

3    submit, will satisfy those goals and have the salutary effect

4    of preserving Mr. Abraham's family.   Thank you.

5              THE COURT:   All right.   Thank you.

6              Mr. Abraham, is there anything you'd like to say

7    today?   Just bring the microphone a little closer, sir, so I

8    can hear you.

9              THE DEFENDANT:   Your Honor, I stand before you today

10   with profound regret and remorse.   I understand the devastation

11   I caused.

12             THE COURT:   I'm sorry, sir.   If you can just speak a

13   little bit louder.   It's just difficult to hear with the high

14   ceilings.   Thank you so much.

15             THE DEFENDANT:   I understand the devastation I caused

16   and I take full responsibility for what I did.   I'm truly sorry

17   for the loss and harm I inflicted on Amazon.   I learn from my

18   mistakes and commit to rebuilding my life in a positive way.

19             I respectfully ask for your mercy and opportunity to

20   prove myself moving forward.   Thank you, your Honor.

21             THE COURT:   Thank you.

22             Is there any reason why sentence cannot be imposed at

23   this time?

24             MR. YUROWITZ:   No, your Honor.

25             MS. KAMAL:   No, your Honor.

OA9VABRS

```
1        THE COURT:  So I'm required to consider the advisory
2    guidelines range of 30 to 37 months, as well as various other
3    factors that are outlined in a provision of the federal law —
4    it's 18 United States Code, Section 3553(a) — and I've done so.
5    Those factors include, but are not limited to, the nature and
6    circumstances of the offense and the personal history and
7    characteristics of the defendant, because each defendant must
8    be considered individually as a person.
9        Judges are also required to consider the need for the
10   sentence imposed to reflect the seriousness of the offense,
11   promote respect for the law, provide just punishment for the
12   offense, afford adequate deterrence to criminal conduct,
13   protect the public from future crimes of the defendant, and
14   avoid unwarranted sentencing disparities, among other things.
15       As I've said at the sentencing of both of
16   Mr. Abraham's brothers who thus far have been sentenced, Yoel
17   and Zishe, all four of the brothers participated in an
18   elaborate scheme and a brazen scheme to defraud Amazon.  And
19   they intentionally, including, you know, Mr. Abraham, who's
20   here before me today — intentionally and extensively
21   overshipped items on purchase orders, at times in the
22   thousands, causing Amazon to pay for goods that it hadn't
23   ordered; engaged in product substitution, giving Amazon
24   essentially worthless things that it didn't ask for; and, you
25   know, throughout the course of the conspiracy, through group
```

OA9VABRS

1    texts and WhatsApp, he and his co-defendants repeatedly

2    discussed how to evade detection by Amazon and reactivate

3    suspended accounts.

4         And unlike his brother Zishe, he didn't seem to have

5    any problem with this conduct or any kind of remorse until he

6    was caught.  And most people are remorseful once they are

7    caught.

8         In terms of his personal history and characteristics,

9    however, Mr. Heshl Abraham, he's 35, he has no other criminal

10   history, there's no history of violence, he's married and he

11   supports and he cares for his six minor children.  I have no

12   doubt that his family will suffer emotionally and financially

13   in his absence, and that's a tragedy.  But as just noted, it is

14   a tragedy of his own making.  It's just often the case that a

15   defendant's family -- that those are the people, as just

16   referred to by counsel, sort of the innocent children, who

17   suffer the most.

18        I read all the letters from his loved ones.  I know he

19   shares a close relationship with his wife and children and

20   parents and siblings and extended family.  I know he

21   volunteers; he's a productive member of his community.  And

22   those are all factors that I am considering today in fashioning

23   an appropriate sentence.

24        So I'm going to consider all of those personal history

25   and characteristics, but also have to ensure that the sentence

1    reflects the seriousness of the offense and promotes respect

2    for the law, provides just punishment and, I think critically

3    in a case like this, deters not just him, but others from

4    engaging in similar conduct.  People are going to see that they

5    are -- in Mr. Abraham's community, but elsewhere in society at

6    large, people will see that there are real serious consequences

7    and painful consequences to engaging in criminal behavior as

8    brazen as this.

9            Ultimately, as a result, I agree with the government

10   and probation that a prison sentence is necessary here, given

11   the egregiousness of the conduct and the importance of

12   deterrence.  But I think that the guidelines range is too high.

13           So I've considered all those factors.  I have also

14   considered the need to avoid unwarranted sentencing

15   disparities, not only with respect to Mr. Abraham's

16   co-defendants, but other defendants in this district and

17   nationwide.

18           So, Mr. Abraham, could you please rise for the

19   imposition of sentence.

20           It is the judgment of this Court that you be committed

21   to the custody of the Bureau of Prisons for a term of 15

22   months, to be followed by a term of supervised release of three

23   years.  I believe that this sentence is sufficient, but not

24   greater than necessary, to comply with the purposes of

25   sentencing set forth in 18 United States Code, Section 3553(a).

OA9VABRS

1          And I just want to note that I think this sentence is

2   consistent, if not lower, than other sentences imposed in this

3   district.  You know, according to a search that I did on the

4   U.S. Sentencing Commission's publicly available interactive

5   data analyzer, that data indicated that for offenses where

6   2B1.1 is the primary guideline and where the defendant was in a

7   sentencing -- you know, the same sentencing zone and D and

8   criminal history category of I, the average length of

9   imprisonment in this district in 2023 was 28 months, the median

10  was 20 months.  And that data comes from 176 separate cases

11  where -- which were reported to the Sentencing Commission.  So

12  I think that this sentence, as I noted, is sufficient, but not

13  greater than necessary.

14          You can be seated, sir, if you'd like, while I read

15  the other aspects of your sentence.

16          So with respect to supervised release, as I said,

17  you'll be on supervised release for three years.  All the

18  standard conditions of supervised release shall apply.  So the

19  standard conditions of supervised release are on pages 31 and

20  32 of the presentence report.

21          Would you like me to read those out loud or do you

22  waive their public reading?

23          MR. YUROWITZ:  We waive the public reading.

24          THE COURT:  Okay.

25          And with respect to the mandatory conditions, would

OA9VABRS

1    you like me to read those out loud or do you waive their public

2    reading?

3            MR. YUROWITZ:  We waive them.

4            THE COURT:  Okay.  Mr. Yurowitz, just make sure that

5    you go over them very carefully.  I'm sure the probation

6    officer will as well, but I want to make sure we do that.

7            I am obligated to read the special conditions of

8    supervised release out loud.

9            I'm going to impose all the special conditions

10   recommended by the probation department.

11           Did you want to be heard on one?

12           MR. YUROWITZ:  Your Honor, I think, just because I've

13   had this issue several times in the Second Circuit --

14           THE COURT:  Sure.

15           MR. YUROWITZ:  -- recently, I think your Honor would

16   have to make special findings as to --

17           THE COURT:  I would, yeah.

18           MR. YUROWITZ:  As to each of the -- I don't know that

19   they are necessary here.  Obviously, you know, he should be

20   supervised by the district of residence.  But as to the other

21   ones, I don't -- you know, particularly the requirement about

22   opening up additional lines of credit, Mr. Abraham would like

23   to be able to, you know, reestablish himself in business and to

24   be able to pay back the victim really.  And just I think the

25   more restrictions that are placed in terms of his ability to

OA9VABRS

1    get financing and things like that, I think it just makes it

2    more difficult.  And I don't think that it's necessary -- I

3    don't think the other special conditions are necessary.  But

4    what I would say is if your Honor is going to impose them, I

5    think special findings are needed.

6            THE COURT:  Okay.  Thank you.

7            I am going to impose the special conditions, but

8    you're absolutely right that I need to make specific findings.

9            With respect to providing the probation officer access

10   to requested financial information, which is one special

11   condition I'm imposing, and the second, that he must not incur

12   new credit card charges or open additional lines of credit

13   without the approval of the probation officer unless he's in

14   compliance with the installment payment schedule, in light of

15   the fact that this was a financial crime, it involved fraud and

16   efforts to evade the victim in this case, and in light of the

17   significant financial penalties, in particular, the consent

18   order of forfeiture that I intend to sign with a very

19   significant amount of forfeiture, I think that these are

20   appropriate to have the probation officer monitor, you know,

21   Mr. Abraham and ensure that he is, in fact, paying as he must,

22   consistent with the installment payment schedules, and to

23   provide access to requested information.

24           Yes.

25           MR. YUROWITZ:  Just for clarification, because -- on

OA9VABRS

1   the second condition, so long as he's in compliance with any

2   installment payment schedule that your Honor sets, do I

3   understand that he can -- he doesn't need the permission?

4           THE COURT:  You must not incur -- so I'm going to read

5   it out loud.  You must not incur new credit card charges or

6   open additional lines of credit without the approval of the

7   probation officer, unless you are in compliance with the

8   installment payment schedule.

9           So if he's in compliance with the installment payment

10  schedule, he does not need to get the approval of the probation

11  officer.

12          MR. YUROWITZ:  Thank you.

13          THE COURT:  Does the government read that the same way

14  that I do?

15          MS. KAMAL:  I do, your Honor.

16          THE COURT:  Yeah.

17          So it's really if he's not in compliance with the

18  payment schedule.  The providing access to requested financial

19  information, I don't know that the probation office even will

20  ask for some, but if it does, he's got to provide it.  And I

21  think that that's appropriate for the reasons I stated.

22          In addition, in light of the nature of the crime, in

23  light of the fraud, in light of the efforts to evade detection,

24  in light of the use of computers to do this, the online aspect

25  of this, I also think that the next special condition proposed

OA9VABRS

1    by the probation office is appropriate; that Mr. Abraham shall

2    submit his person and any property, residence, vehicle, papers,

3    computer, other electronic communication, data storage devices,

4    cloud storage or media and effects to a search by any United

5    States Probation Officer and, if needed, with the assistance of

6    law enforcement.

7         The search is to be conducted when there is reasonable

8    suspicion concerning a violation of a condition of supervision

9    or unlawful conduct by the person being supervised — that will

10   be Mr. Abraham.  Failure to submit to a search may be grounds

11   for revocation of release.  He shall warn any other occupants

12   that the premises may be subject to search pursuant to this

13   condition.  Any search shall be conducted at a reasonable time

14   and in a reasonable manner and he will be supervised in the

15   district of his residence.

16        So those are the special conditions of supervised

17   release.

18        I'm not going to impose a fine.  I think it would be

19   difficult for Mr. Abraham to pay one, as the probation

20   department noted, particularly in light of, as I said, the

21   forfeiture order that will follow.

22        I'm required to impose the mandatory special

23   assessment or fee of $100.  That must be paid immediately.

24        With respect to restitution, I am ordering

25   restitution, but I'm reserving judgment on the amount.  See the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OA9VABRS

1    *Dolan* case, 560 U.S. 605, 608.  I'm going to refer the amount

2    of restitution to a magistrate judge for a recommendation.

3    You'll have an opportunity to object to the recommendation of

4    the magistrate judge.  Ultimately, I will make the

5    determination as appropriate.  So you should see that referral

6    order on the docket later today or tomorrow.

7             And then with respect to forfeiture, I am signing and

8    incorporating into my sentence today and into the judgment the

9    consent preliminary order -- excuse me, the amended -- let me

10   just get it out.  I have the wrong one in front of me.  The

11   amended consent preliminary order of forfeiture as to specific

12   property and money judgment that I understand was signed today

13   by Mr. Abraham and his counsel, as well as AUSA Kamal.

14            And I'm not going to read the entire order, but I am

15   going to say that a money judgment in the amount of

16   $1,302,830.95 will be ordered.  But as I said, I'm

17   incorporating the entirety of this amended forfeiture order.

18            All right.  Does either counsel know of any legal

19   reason why this sentence cannot be imposed?

20            MS. KAMAL:  No, your Honor.

21            I would also, however, just at this time like to note

22   for the record that a representative of the victim is here

23   today for the purposes of sentencing.  It's my understanding

24   they don't have anything to add, in addition to what they

25   already have in writing in the proceeding.  But I did just want

OA9VABRS

```
1   to note that for the record.

2               THE COURT:  No, thank you.

3               I saw him here.  I'd asked at the last two sentencings

4   if he wanted to speak, and he didn't.  But I should have asked

5   you anyway.

6               Sir, would you like to be heard?

7               UNIDENTIFIED SPEAKER:  No, your Honor.

8               THE COURT:  Okay.  Thank you.

9               And I have read the letter on behalf of the victim.

10              MS. KAMAL:  Other than that, your Honor, the

11  government sees no reason that sentence cannot be imposed.

12              THE COURT:  Thank you.

13              And I'll just note that this sentence is, of course,

14  you know, half of the low end of the guidelines.  The probation

15  department here recommended a below-guideline sentence, but I

16  went even lower because I thought it was appropriate to do so

17  in light of the mitigating circumstances.

18              MR. YUROWITZ:  Your Honor, as far as any reason why

19  the sentence can't be imposed, no, we have no comment.  I would

20  want to be heard in terms of recommendations.

21              THE COURT:  Sure.  Let me first -- why don't we do

22  this.  Yeah, why don't we talk about a surrender date and then

23  any recommendations you have for a facility.

24              MR. YUROWITZ:  In terms of recommendation for a

25  facility, I would ask for the Otisville camp.
```

OA9VABRS

1              In terms of the date of surrender --

2              THE COURT:  I didn't hear you.

3              MR. YUROWITZ:  I would ask for if your Honor could

4    recommend the Otisville camp.

5              THE COURT:  I will do so.

6              MR. YUROWITZ:  And in terms of date for surrender,

7    maybe the government has a better sense or maybe your Honor,

8    how long it's taking to designate these days; because I would

9    just ask that it be a date that he --

10             THE COURT:  Yeah.  So just so you know, defendants are

11   no longer sent to the MDC in advance of sentencing.  So to the

12   extent that that was a concern of yours, that would not happen.

13             I do expect a designation to be made within the 60-day

14   period.  And my understanding is that, as I said, people are

15   not going to MDC, they are being sent directly to the place of

16   designation.

17             MR. YUROWITZ:  If I could -- does your Honor know,

18   have they been taking the full 60 days?  I think Mr. Abraham's

19   feeling is to the extent that he's going to have to go in, he

20   would like to do it sooner rather than later and get it over

21   with to be back to his family.  But I just don't want to ask

22   for a date that it's -- you know, that have to come back to

23   your Honor.

24             THE COURT:  No, I understand that.

25             Does the government have any suggestions for how we

OA9VABRS

1    can do this?

2          MS. KAMAL:  So my understanding, your Honor, is at the

3    moment the designation process and duration is really driven by

4    the surrender date imposed by the Court.  I certainly have

5    encountered the situation where the surrender date arrives and

6    it's the day before and the defendant does not know where they

7    are necessarily supposed to go and they hear it the very last

8    minute.

9          I have not heard though yet of surrender dates being

10    missed by a failure to designate.  If that, in fact, were the

11    case, as the Court's noted, I mean, the defendant would simply

12    stay out.  But I think at this point, as you can probably

13    intuit, the government's open here to a reasonable period for

14    the defendant to prepare and to surrender.  So I really think

15    it goes back to defense counsel.

16          THE COURT:  Obviously, I assume he wants to be home

17    for Yom Kippur.  But, I mean, do you want to choose a date like

18    November 4th, and then maybe I can ask the government just to

19    confirm the week before that, in fact, that, you know, he can

20    be designated, or you can reach out sooner and see if that's a

21    reasonable date for designation and, if not, we can put it off.

22          MR. YUROWITZ:  Your Honor, if we could do November

23    4th.  And then with the understanding that if it becomes

24    necessary to push it off --

25          THE COURT:  Yes.

OA9VABRS

1        MR. YUROWITZ:  -- we come back to it.

2        THE COURT:  Okay.

3        So I'm just going to ask the government and counsel to

4   be in coordination.  And if you need my involvement, I'm happy

5   to get involved.

6        MR. YUROWITZ:  Thank you, your Honor.

7        MS. KAMAL:  Certainly, your Honor.

8        THE COURT:  Okay.

9        So, Mr. Abraham, that's the sentence of this Court.

10       You have a right to appeal your conviction and

11  sentence except to whatever extent you may have validly waived

12  that right as part of your plea agreement.

13       If you do choose to appeal, the notice of appeal must

14  be filed within 14 days of the Judgment of Conviction.

15       If you're not able to pay for the costs of an appeal,

16  you may apply for leave to appeal *in forma pauperis*, which

17  simply means that court costs such as filing fees will be

18  waived.

19       If you request, the Clerk of Court will prepare and

20  file a notice of appeal on your behalf.

21       Does the government move to dismiss the underlying

22  indictment?

23       MS. KAMAL:  Yes, your Honor.

24       THE COURT:  Okay.  It will be dismissed.

25       You know, so, Mr. Abraham, as I said to your brothers,

OA9VABRS

```
 1    and I often say at sentencing because I so firmly believe this
 2    to be true, I don't think people need to be defined by the
 3    worst mistakes they've ever made or the worst decisions they've
 4    ever made.  I don't think you need to be defined by this.
 5           You obviously have an incredibly loving family and
 6    community who support you.  As I said earlier, I read all of
 7    those letters that are really a tribute to you.  And they
 8    described you as, you know, supportive and helpful and selfless
 9    and compassionate, among many other things.  And I know that
10    there will be a lot more that you define yourself by going
11    forward.  And I wish you luck in the future.
12           Are there any other applications at this time?
13           MS. KAMAL:  Not from the government.
14           Thank you, your Honor.
15           MR. YUROWITZ:  Your Honor, just -- I know that when he
16    was arrested, he posted bail, Mr. Abraham posted bail.  I think
17    that money, some of it, was borrowed from others, and I think
18    he's anxious to be able to get that back.
19           THE COURT:  Once he surrenders, you should submit a
20    proposed order to me, hopefully on consent; I don't imagine
21    that will be a problem.  I'll sign that as soon as I get it.
22           MR. YUROWITZ:  Thank you.
23           THE COURT:  Thank you.  We're adjourned.
24                          *    *    *
25
```